IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Patrick George,<br><br>               Plaintiff,<br><br>v.<br><br>The George Washington University,<br><br>               Defendant. | Civil Action No. 1:22-cv-896-BAH |

### THE GEORGE WASHINGTON UNIVERSITY'S OPPOSITION TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER

A temporary restraining order ("TRO") "is an extraordinary remedy," which "should not be granted unless the movant, by a clear showing," demonstrates that he is likely to "suffer irreparable harm absent preliminary injunctive relief." *Open Tech. Fund v. Pack*, 470 F. Supp. 3d 8, 16-17, 28 (D.D.C. 2020) (Howell, C.J.) (internal quotation marks omitted). Here, Plaintiff Patrick George, a disappointed former member of the George Washington University men's varsity rowing team seeks a TRO requiring the University to "immediately restore" the team to "varsity status." *See* Mot. at 1. Why? Not because he can no longer row. Indeed, he (and other members of the former varsity men's rowing team) have continued to row for GW as a club team and competed in many of the very same events in which the team would have competed if it had maintained its varsity status. And not because George lost his student status at GW. He has been and continues to be a matriculating student, who is scheduled to graduate in May 2022. And not because he lost his scholarship: he has received and continues to receive financial assistance to attend the University. So why is he seeking a TRO? According to George, the Intercollegiate Rowing Association ("IRA") will hold a "final eligibility meeting" the week of April 25, 2022 to determine which teams can compete in the June 2022 IRA National Collegiate Championship

1

Regatta, and the University club team will not be eligible to participate unless "GW reinstates the program to 'varsity status'" prior to that meeting. Compl. ¶ 82.[1] But while George maintains this is an "emergency" requiring immediate relief, he has known since *July 2020*—that is, *for almost two full years*—that the University's men's rowing team would no longer compete at the varsity level after the 2020-2021 season. *See* Compl. ¶¶ 50-52. For this and many other reasons, George's attempted abuse of the TRO process should be rejected.

*First*, and most importantly, George has not shown that any of his three claims against the University—for breach of contract (Count I), fraud (Count II), or alleged violations of the DC Consumer Protection Procedures Act, D.C. CODE §§ 28-3901 *et seq.* (Count III)—can withstand the University's forthcoming motion to dismiss, much less that he is "likely" to succeed on the merits of these claims, as required to sustain a TRO. *See Open Tech. Fund*, 470 F. Supp. 3d at 16.

*Second*, George cannot show that he would suffer "irreparable harm" in the absence of a TRO. While George suggests that he will be irreparably harmed if he is unable to compete in **one** event—the IRA National Collegiate Championship Regatta in June—"it is well established that ineligibility for participation in interscholastic athletic competitions alone does not constitute irreparable harm." *Sharon City Sch. Dist. v. Pa. Interscholastic Athletic Ass'n, Inc.*, 2009 WL 427373, at *2 (W.D. Pa. 2009). In other words, while "not being able to play on game day is certainly a disappointment," it simply does not "constitute the type of harm warranting the extraordinary remedy of injunctive relief." *Cruz v. P.I.A.A.*, 2000 WL 1781933, at * 1 (E.D. Pa. Nov. 20, 2000).

---

[1] George also suggests that emergency relief is warranted because the men's rowing team's "first event" of the season "is scheduled for April 2, 2022 against Georgetown University's varsity men's rowing team." Compl. ¶ 83. In actuality, the University men's rowing team has been competing in events throughout the 2021-2022 academic year as a *club* sport; Saturday's event against Georgetown was by no means the "first event" of the club season. Moreover, there was no need for court intervention to enable the men's rowing team to compete on April 2nd, as evidenced by the fact that the team *did* participate in the event. *See* Decl. of T. Vogel ¶ 13.

2

*Third*, the balance of the equities and the public interest weigh strongly against the entry of a TRO here. Issuance of a TRO requiring GW to reinstate a team to "varsity status" that it decided to discontinue as a varsity sport almost two years ago "would thrust this Court into the role of a University overseer, second-guessing spending and resource-allocation decisions made by the University's governing body." *Bell v. Univ. of Hartford*, 2021 WL 6070496, at *7 (D. Conn. Dec. 22, 2021). "Courts have generally steered clear of such roles," and have deferred to universities as the subject-matter experts on how "to run institutions of higher education" and athletic programs. *Id*. George has provided no compelling reason for this Court to depart from that well-established principle in this case.

## STATEMENT OF FACTS

In 2018, Plaintiff Patrick George enrolled at GW and joined the men's varsity rowing team. Compl. ¶¶ 21, 29, 32. According to George, Mark Davis, then-head coach of the men's rowing team, had encouraged George to attend GW in order to help the men's rowing team "create a legacy." *Id*. ¶ 21. Although George did not receive an athletics scholarship for his freshman year at GW (2018-2019), *id*., George maintains that Coach Davis assured him that he "***could*** earn scholarships" in future years, *id*. ¶ 28 (emphasis added).

On June 25, 2019, George did, in fact, sign an Athletics Financial Aid Agreement (the "Agreement") for the 2019-2020 academic year (his sophomore year), pursuant to which he was given a $60,000 award.[2] Decl. of T. Vogel, Ex. A. The Agreement made clear that it was "the

---

[2] Because George's scholarship agreements are referred to in the complaint and are central to his allegations, the University intends to rely on them in its forthcoming motion to dismiss. *See, e.g.*, *Marshall v. Honeywell Tech. Sols., Inc.*, 536 F. Supp. 2d 59, 65-66 (D.D.C. 2008) (explaining that "where a document is referred to in the complaint and is central to the plaintiff's claim," the document can be considered on a motion to dismiss without converting the motion to one for summary judgment).

only binding agreement between the University and [George]." *Id*. It also stated that "Coaches and other university employees cannot obligate the University beyond this agreement." *Id*.

In or around November 2019, in the beginning of George's sophomore year, Coach Davis left the University. Compl. ¶ 42. A few months later, in January 2020, GW hired Eric Gehrke as its new varsity men's rowing coach. *Id*. ¶ 43. In March 2020, the COVID-19 pandemic ended the men's rowing season. *Id*. ¶ 44. According to George, Coach Gehrke held a meeting with the men's rowers in May 2020, during which he "offered Mr. George a $70,000 scholarship in return for Mr. George's continued participation in the varsity Men's rowing team." *Id*. ¶ 47. George now claims that during this May 2020 meeting, Coach Gehrke did not just offer George a $70,000 scholarship for his junior and senior years, but that he also offered him a scholarship "to continue rowing on the varsity Men's Rowing Team *through the end of the 2022-2023 academic year*"— that is, for a fifth year, *after* George already would have graduated from GW. *See* Compl. ¶ 56; *id*. ¶ 84 (referring to alleged "May 2020 promise to grant Mr. George a $70,000 scholarship for the 2022-2023 academic year).[3]

On July 10, 2020, George signed another Agreement, pursuant to which he was given a $70,000 "renewal" award for the 2020-2021 academic year (his junior year). Decl. of T. Vogel, Ex. B. Notwithstanding the alleged promises made by Gehrke in May 2020, this July 2020 Agreement made clear to George that it was "the only binding agreement between the University and [George]" and that "Coaches and other university employees cannot obligate the University beyond this agreement." *Id*.

---

[3] Confusingly, George suggests that this promise of an additional year of athletic scholarship post-graduation was made in the context of the NCAA announcing "that it would extend all collegiate athletes' eligibility for one year as a result of the canceled seasons." Compl. ¶ 45. However, George concedes elsewhere in his Complaint that men's rowing is *not* an NCAA sport. *See id.* at n.1. Accordingly, the additional year of eligibility provided to NCAA athletes as a result of the COVID-19 pandemic has no bearing on men's rowers.

4

On July 31, 2020—the summer between George's sophomore and junior years—GW announced that it was reducing its number of varsity athletics teams from 27 to 20, and that men's rowing was one of the seven teams that would no longer have varsity status. Compl., Ex. 2. The University explained that the COVID-19 pandemic had created "a significant gap between expected revenues and expenses of at least $200 million," and that after conducting a review of all University programs, the University had decided to eliminate all four of its non-NCAA varsity sports (men's rowing, co-ed sailing, and men's and women's squash) as well as three of its NCAA sports (men's indoor track, men's tennis, and women's water polo). *Id.*[4] The University explained that participants on these varsity teams would "have the opportunity to compete in their upcoming 2020-21 seasons" as a varsity sport to the extent it became safe to do so, but that the teams would be discontinued as varsity sports after the 2020-2021 season. In other words, student athletes were given one year's notice of the change. The University further explained that it would continue to "support these programs in their transitions to club sports," meaning that interested students could still have the opportunity to participate in the sports on club teams but not with the "varsity" title." In particular, men's rowing—as a non-NCAA sport—could "continue to compete in the same or similar conferences against the same competition that they did as [a] varsity program[]," assuming there was "sufficient student interest and self-sustaining financial support." Compl., Ex. 3.

In addition to offering men's rowers the opportunity to continue to compete at the club level beyond the 2020-2021 season, the University also made clear that "[a]ll existing athletics scholarship aid will continue to be awarded to the affected student-athletes *through their graduation at GW*." Compl., Ex. 2 (emphasis added).

---

[4] The National Collegiate Athletic Association ("NCAA") is an organization that administers certain intercollegiate athletics. Four of the sports that GW decided would not continue as varsity teams after the 2020-2021 season—men's rowing, co-ed sailing, and men's and women's squash—do not compete in the NCAA and are not subject to NCAA rules. All of GW's remaining athletic programs participate in the NCAA. *See* Decl. of T. Vogel ¶ 8.

George participated on GW's varsity men's rowing team during its final season as a varsity sport in 2020-2021 (his junior year). *See* Compl. ¶¶ 70-71. George concedes that when he participated in the IRA National Championship Regatta in May 2021, he and the team were "participat[ing] in what [they] believed could be the last national championship event." *Id.* ¶ 70.

In the fall of 2021, George began his senior year at GW. George admits that GW "appears to be fully performing its obligation to provide Mr. George with a $70,000 scholarship" for the 2021-2022 academic year, even though he is no longer participating on a varsity sports team. Compl. ¶ 72. Because men's rowing was discontinued as a varsity sport at the conclusion of the 2020-2021 season, George was not required to sign another Agreement in order to receive financial aid for the 2021-2022 academic year. *See* Decl. of T. Vogel ¶ 10.

This year, George and the GW men's club rowing team participated in the Head of the Potomac Regatta in September 2021, and the Head of the Charles and Head of the Schuylkill Regattas in October 2021. *See* Decl. of T. Vogel ¶ 13. Most recently, the team participated in an April 2, 2022 regatta against Georgetown University. *See id.* Nevertheless, George contends that as a result of the men's rowing team's "demot[ion] to a 'club' sport," the team is not eligible to compete in the upcoming IRA National Championship Regatta, which is scheduled for June 2022. Compl. ¶¶ 81-82. According to George, he "filed an exception request with the IRA" in March 2022, seeking permission from the IRA for GW to participate in the IRA National Collegiate Championship Regatta notwithstanding the team's "club" status. *Id.* ¶ 81. However, the IRA "denied the exception because the Men's Rowing Team no longer satisfied the 'varsity status' requirement under the IRA's Constitution." *Id.* ¶ 82. The IRA apparently told George that GW could "compete in future IRA events if GW reinstates the program to 'varsity status'" and that it was holding a "final eligibility meeting" during the week of April 25, 2022. *Id.*

On April 1, 2022, George provided GW with a copy of a Verified Complaint, Motion for a Temporary Restraining Order, and Motion for Expedited Discovery, which his attorney said had been filed earlier that day in D.C. Superior Court. GW was not served with a summons. *See* Wanger Decl. ¶¶ 4-5. In the Complaint, George brings claims against GW for breach of contract (Count I), fraud (Count II), and alleged violations of the DC Consumer Protection Procedures Act, D.C. CODE §§ 28-3901 *et seq.* (Count III). In his TRO, George seeks an order requiring GW to "immediately reinstate the Men's Rowing Team as a varsity sport" and to "honor[] Mr. George's scholarship commitment through the end of the 2022-2023 academic year." Mot. at 18. GW removed the case to federal court on April 4, 2022. *See* Dkt. 1. The next day, George re-filed a slightly modified version of his Motion for a TRO in this Court, seeking the same relief. *See* Dkt. 2. The Court has scheduled a hearing on the Motion for a TRO for today, April 7, 2022.

## LEGAL STANDARD

In evaluating whether a motion for a TRO should be granted, a plaintiff must establish that "(1) [he] [is] likely to succeed on the merits, (2) [he] [is] likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in [his] favor, and (4) an injunction is in the public interest." *Open Tech. Fund v. Pack*, 470 F. Supp. 3d 8, 16 (D.D.C. 2020) (Howell, C.J.) (citing *Winter v. Nat'l Res. Def. Council*, 555 U.S. 7, 20 (2008)). In assessing these factors, the first—the plaintiff's likelihood of success on the merits—is "'the most important." *Id.* (quoting *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014)). Ultimately, a TRO "'should not be granted unless the movant, by a clear showing, carries the burden of persuasion' on each of the factors." *Id.* (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). Where, as here, "the requested preliminary relief would alter the status quo, the standard the movant must satisfy is especially 'demanding.'" *Id.* (quoting *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 319 (D.C. Cir. July 31, 2018)).

7

# ARGUMENT

Here, George has not met his burden of persuasion with respect to any of the factors that courts consider in assessing whether to issue a TRO. In particular, George has not shown that he is likely to succeed on the merits of any of his claims; that he will suffer irreparable harm in the absence of a TRO; or that the equities or public interest weigh in favor of entering a TRO.

## I. George Cannot Show A Likelihood of Success on the Merits

First, George has not pled sufficient facts to support *any* viable legal claim against GW—much less that he is likely to succeed on the merits of any of those claims.

### A. *Breach of Contract (Count I)*

George alleges first that GW (i) breached its promise to him to "maintain the Men's Rowing Team as a varsity sport throughout his years of eligibility, which include through the 2022-2023 season" (Compl. ¶ 90) and (ii) anticipatorily breached its promise to "award him with a $70,000 scholarship through the end of the 2022-2023 academic year." (*Id.* ¶ 93). He has failed to plead sufficient facts to support either theory.

With respect to his first theory, George fails to allege any facts to show that anyone at GW promised to "maintain the Men's Rowing Team as a varsity sport throughout his years of eligibility." Compl. ¶ 90. George alleges that in 2018, he was offered a "non-scholarship position" on the men's rowing team. *Id.* ¶ 21. He also alleges that former head coach Mark Davis "assure[d]" him that he "*could* earn scholarships for the remaining years of his eligibility," *id.* ¶ 28 (emphasis added), and that in May 2020, Coach Gehrke made a "fifth-year offer to Mr. George," *id.* ¶ 48. None of these alleged statements is sufficient to support an express or implied promise by anyone at GW to George that the men's rowing team would be maintained as a varsity sport for as long as George remained eligible to row. *See, e.g.*, *Sterman v. Brown Univ.*, 513 F. Supp. 3d 243, 252 (D.R.I. 2021) (finding that plaintiffs could not "point to any evidence that [the University]

8

made a specific, enforceable promise that they would get to play four years of varsity squash" because the coach's use of the word "varsity" and reference to four years "were at best aspirational, and [did] not rise to the level of enforceable contractual terms").

Indeed, George has not even pled sufficient facts to show how many years of eligibility he *has* to row. While George suggests he is eligible for at least a "fifth-year," Compl. ¶ 48, he does so in the context of explaining that the NCAA "announced that it would extend all collegiate athletes' eligibility for one year as a result of the canceled seasons," *id.* ¶ 45. But of course, "men's rowing is not a sport sanctioned by the NCAA," *id.* at n.1, and thus, the NCAA rules do not apply to George. When George alleges, then, that GW promised to "maintain the Men's Rowing Team as a varsity sport throughout his years of eligibility," it is not even clear how many years he believes GW has "promised" him he could row. *See, e.g.*, *Rosenthal v. Nat'l Produce Co.*, 573 A.2d 365, 370 (D.C. 1990) (explaining that "contract must be sufficiently definite as to its material terms (which include, e.g., . . . duration) that the promises and performance to be rendered by each party are reasonably certain").

Moreover, even if any of these alleged oral statements were sufficiently specific to be actionable, George's claim still would be barred by the statute of frauds, which prevents the enforcement of oral contracts that cannot be performed within one year of their formation. *See* D.C. Code § 28-3502; *Clampitt v. Am. Univ.*, 957 A.2d 23, 30-31 (D.C. 2008) (under the statute of frauds, "no action may be brought upon an agreement that is not to be performed within one year from the making thereof, unless the agreement . . . is in writing, . . . signed by the party to be charged therewith or a person authorized by him" (internal quotation omitted)). Because George alleges that various GW coaches promised him that the men's rowing team would maintain its varsity status for at least four or five years, such an alleged agreement necessarily could not have

9

been performed within one year, and thus, is unenforceable. *See, e.g.*, *Clampitt*, 957 A.2d at 31 (alleged promise that plaintiff could retire in eleven years failed under the statute of frauds).

With respect to his second theory of breach of contract—*i.e.*, that GW breached a supposed contract to provide him with a $70,000 scholarship for the 2022-2023 academic year—George's theory fails on multiple levels. First, George's claim based upon an alleged oral contract made in May 2020 is again barred by the statute of frauds. *See* D.C. Code § 28-3502; *Clampitt*, 957 A.2d at 30-31. In other words, even assuming that Gehrke did, in fact, orally offer George a scholarship for the 2022-2023 academic year, such a contract could not be performed within one year and is therefore unenforceable under the statue of frauds. *See, e.g.*, *Gharib v. Wolf*, 518 F. Supp. 2d 50, 54-55 (D.D.C. 2007) (dismissing claim pursuant to statute of frauds based on alleged breach of oral employment contract for ten-year term).

Second, even if Gehrke ***did*** make this promise to George in May 2020, George proceeded to sign an Athletics Financial Aid Agreement in July 2020, pursuant to which he was provided with a $70,000 award, and was notified that the Agreement was "the only binding agreement between the University and [George]" and that "Coaches and other university employees cannot obligate the University beyond this agreement." *Id*. This Agreement plainly superseded any alleged oral promises that predated it. *See, e.g.*, *Intelsat USA Sales Corp. v. Juch-Tech, Inc.*, 935 F. Supp. 2d 101, 113 (D.D.C. 2013) (explaining that "[w]hen deciding contract claims, [D.C.] courts ordinarily focus on the contract's written language instead of earlier promises," and that "[t]his rule applies with even greater force if the contract contains a clause—usually referred to as a 'merger clause' or an 'integration clause'—indicating that the contract represents a complete and final expression of the parties' wishes").

Third, even assuming that George's breach-of-contract claim were not barred by the statute

of frauds or superseded by his subsequent written agreement, he has failed to allege any facts showing that GW has communicated "unequivocally and positively its intention" **_not_** to provide him with a scholarship for the 2022-2023 year, as he would need to do in order to bring a claim for breach of contract. *Order of AHEPA v. Travel Consultants, Inc.*, 367 A.2d 119, 125 (D.C. 1976). Instead, George alleges only that he has "twice asked GW whether it intends to honor its May 2020 promise to grant" him a scholarship; significantly, he does not plead how or whether GW has responded. Compl. ¶ 84. Because George does not allege that GW has unequivocally and positively communicated that it will **_not_** provide him with the scholarship he claims to have been promised, he cannot state a claim for breach of contract. *See AHEPA*, 367 A.2d at 125 (in order for "repudiation of a contract by one party to be sufficient to give the other party the right to recover for breach, the repudiating party must have communicated, by word or conduct, unequivocally and positively its intention not to perform").

### B. *Fraud (Count II)*

George next alleges that GW (1) falsely represented "during his recruiting, and again in May 2020, that the Men's Rowing Team would remain a varsity sport at GW throughout his collegiate athletic eligibility years," and/or (2) "intentionally and knowingly withheld . . . the fact that it was considering cutting the Men's Rowing Team as a varsity sport prior to the conclusion of his collegiate athletic eligibility years." Compl. ¶¶ 96-97. Both fraud theories fail.

"In alleging fraud or mistake, a party must state **_with particularity_** the circumstances constituting the fraud or mistake." Fed. R. Civ. P. 9(b) (emphasis added). "Pleading fraud with particularity requires the pleader to state the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of that fraud, as well as the identity of the individuals allegedly involved in the fraud." *Lewis v. Full Sail, LLC*, 266 F.

11

Supp. 3d 320, 325 (D.D.C. 2017) (internal quotation marks and alterations omitted). George has not met any of these requirements.

He has pointed to no specific, actionable statement made by anyone connected with his recruiting process that was false at the time it was made. Instead, he alleges only that some unidentified person at "GW falsely represented . . . that the Men's Rowing Team would remain a varsity sport at GW throughout his collegiate athletic eligibility years." Compl. ¶ 96. George does not allege who made this statement; the date, time, or place that it was made; or the context in which it was said. As a result, George's allegations fall far short of what is required under Rule 9(b). *See, e.g.*, *Lewis*, 266 F. Supp. 3d at 325.

Likewise, George alleges only that during a May 2020 meeting, "Coach Gehrke offered Mr. George a $70,000 scholarship in return for Mr. George's continued participation in the varsity Men's Rowing Team," Compl. ¶ 47, and that he did so supposedly while he knew that GW "***was considering cutting*** the Men's Rowing Team as a varsity sport prior to the conclusion of his collegiate athletic eligibility years," *id*. (emphasis added). Those facts, even if true, do not state a claim for fraud. By George's own admission, Gehrke at most thought the University was "considering cutting" the team in May 2020. George does not allege that Gehrke ***knew*** there would ***not*** be a varsity Men's rowing team in the 2021-2022 or 2022-2023 seasons at the time that he allegedly offered George a scholarship to participate on the team, as he would need to have done to show that Gehrke's statement was fraudulent. *See, e.g.*, *Iacangelo v. Georgetown Univ.*, 2010 WL 4807082, at *7 (D.D.C. Nov. 19, 2010) (fraud requires, among other elements, "(1) a false representation (2) made in reference to a material fact, (3) with knowledge of its falsity"). Indeed, the fact that Gehrke offered George a scholarship to participate on a varsity team reflects that he likely did believe there would be a varsity team on which George could participate in the 2021-

2022 season. Fraud cannot be established by allegations that are "equally consistent with either honesty or deceit." *Caulfield v. Stark*, 893 A.2d 970, 974 (D.C. 2006).

Moreover, even if Gehrke knew it was ***possible*** that the varsity men's rowing team would be disbanded for the 2021-2022 season and beyond, his failure to disclose that fact does not amount to fraud for several reasons. First, George has not pled facts to show that whether the team would maintain its varsity status was information that Gehrke had a duty to disclose. *See Iacangelo*, 2010 WL 4807082, at *7 (nondisclosure constitutes fraud only if there is a "duty to disclose"); *see also Ali v. Mid-Atlantic Settlement Servs., Inc.*, 640 F. Supp. 2d 1, 8-9 (D.D.C. 2009) (nondisclosure or silence regarding a material fact "does not constitute fraud unless there is a duty to speak" (quoting *Kapiloff v. Abington Plaza Corp.*, 59 A.2d 516, 517 (D.C. 1948)).

Second, George does not identify anywhere in his Complaint "an action that [wa]s taken in reliance upon" Gehrke's supposed nondisclosure in May 2020. *See id*. He does not allege that he would have done anything differently if he had known in May 2020—as opposed to July 2020—that there would not be a men's varsity rowing team in the 2021-2022 season. And of course, George alleges that GW provided him "with a $70,000 scholarship in exchange for Mr. George's participation on the Men's [non-varsity] Rowing Team for the 2021-2022 academic year," which he accepted. Compl. ¶ 72. In other words, George decided to continue rowing for GW during the 2021-2022 academic year with full knowledge of the fact that he was participating on a club team that lacked varsity status and that GW had no intention of returning to varsity status. George has not pled facts to explain how his choice would have been any different if he had known in May 2020—rather than July 2020—that the team was losing (or might be losing) its varsity status.

C. *D.C. Consumer Protection Procedures Act (Count III)*

George also claims that GW violated the DC Consumer Protection Procedures Act ("DCCPPA") by "falsely representing to Mr. George during his recruiting, and again in May 2020,

13

that the Men's Rowing Team would remain a varsity sport at GW throughout his collegiate athletic eligibility years (or, alternatively, by withholding that it would not)." Compl. ¶ 105. This claim fails for the threshold reason that the DCCPPA applies only to transactions that involve "consumer goods or services." *Stone v. Landis Constr. Co.*, 120 A.3d 1287, 1289 (D.C. 2015) (explaining that the DCCPPA was "designed to police trade practices arising only out of consumer-merchant relationships, and does not apply to commercial dealings outside the consumer sphere").

The statute defines a "consumer good or service" as one that is used for "personal, household, or family purposes." DCCPPA § 28-3901(a)(2)(B)(i). The DCCPPA "does not reach transactions intended primarily to promote business or professional interests." *Shaw v. Marriott Int'l Inc.*, 605 F.3d 1039, 1043-44 (D.C. Cir. 2010). George alleges that he attended GW because of its "educational breadth and opportunities." Compl. ¶ 25. He does not allege that he attended GW to get an education "with no intention of using it to make money" or to obtain employment. *MacDonald v. Thomas M. Cooley Law School*, 724 F.3d 654, 660 (6th Cir. 2013) (law school students were not "consumers" of services within the meaning of Michigan's similarly worded consumer protection statute). Because the relationship between George and the University was not a consumer transaction, but one of a student and a nonprofit provider of educational services, the DCCPPA is inapposite. *See id*.

George's DCCPPA claim is also barred by D.C. Code § 28-3905(k)(5). That section provides that an action against a "nonprofit organization" cannot be based on "training or credentialing activities" or any "dispute not arising from the purchase or sale of consumer goods or services in the ordinary course of business." GW is a nonprofit, and George claims that GW "engaged in unfair or deceptive trade practice in marketing and selling its higher educational services" to him, Compl. ¶ 105, which are "training" and "credentialing" services. *See* Webster's

New Collegiate Dictionary at 1229 (1979) (defining "train" as "to teach so as to make fit, qualified or proficient"). Thus, George has no right of action based on GW's provision of these services.

## II. George Cannot Show Irreparable Harm

Not only do George's three claims all fail on the merits, but George also has failed to show how he will suffer any cognizable harm in the absence of a TRO—much less "irreparable harm."

Courts repeatedly have held that "ineligibility for participation in interscholastic athletic competitions alone does not constitute irreparable harm." *Sharon City Sch. Dist. v. Pa. Interscholastic Athletic Ass'n, Inc.*, 2009 WL 427373, at *2 (W.D. Pa. 2009); *Dziewa v. Pa. Interscholastic Athletic Ass'n, Inc.*, 2009 WL 113419 at * 7 (W.D. Pa. 2009) ("the loss of an opportunity to play interscholastic athletics for one year does not constitute irreparable harm"); *McGee v. Virginia High Sch. League, Inc.*, 801 F. Supp. 2d 526, 531 (W.D. Va. 2011) (explaining that "[c]ourts have routinely rejected the notion that a student suffers irreparable harm by not being permitted to participate in interscholastic athletics"). While George may be deeply disappointed by his inability to compete in the IRA National Championship Regatta in June, there is no "right to participate in any particular sport in one's college," *Gonyo v. Drake Univ.*, 837 F. Supp. 989, 994 (S.D. Iowa 1993), much less a right to participate in any particular sporting *event.* And even if the IRA National Championship Regatta is of "great emotional significance" for George, he still can engage in the "core recreational activity" at issue—*i.e.*, University men's rowing. *See, e.g.*, *Safari Club Int'l v. Jewell*, 47 F. Supp. 3d 29, 35 (D.D.C. 2014) (no irreparable harm justifying TRO where elephant hunters could still "engage in the core recreational activity of hunting").

George's unreasonable delay in filing suit further undercuts his alleged entitlement to the "emergency" relief that he seeks in his Motion for a TRO. George was well aware as of July 31, 2020—almost a full two years ago—that the University men's rowing team would no longer have varsity status. Compl. ¶ 3. He concedes that when he participated in the IRA National

15

Championship Regatta in May 2021, he understood that it "could be the last national championship event" in which he could participate. *Id.* ¶ 70. To the extent that George wanted to continue to compete at the varsity level beyond the 2020-2021 season, he could have transferred to another university; he did not. Instead, George alleges that he made a written formal request that the team's varsity status be reinstated in August 2021 and did not receive a response. *Id.* ¶ 77. And yet, he waited an additional eight months—until April 2022—to file this Motion for a TRO.

Courts often find that delays of a few months indicate the absence of the kind of irreparable harm needed to support a TRO. *See, e.g.*, *Equity in Athletics, Inc. v. U.S. Dep't of Educ.*, 291 F. App'x 517, 521-22 (4th Cir. 2008) (failure to file suit against university until June 2007, when program cuts approved and publicized in September 2006, weighed heavily against entry of preliminary injunction); *Heart 6 Ranch, LLC v. Zinke*, 285 F. Supp. 3d 135, 144 (D.D.C. 2018) (delay undermines a showing of irreparable injury) (citing cases). Here, George waited almost a full two years to bring suit based on an alleged "emergency" of which he has been aware since July 2020. Under these circumstances, he has failed to show that a TRO is justified.[5]

## III. The Balance of the Equities and Public Interest Weigh in Favor of GW

A party seeking a TRO also must establish that the balance of the equities tips in his favor, and that an injunction would be in the public interest. *Winter*, 555 U.S. at 20. "These factors require courts to 'balance the competing claims of injury and . . . consider the effect on each party

---

[5] To the extent that George's alleged "emergency" relates instead to the University's supposed failure to confirm for him whether it intends to honor its alleged "promise" to grant him a scholarship for the 2022-2023 academic year (Compl. ¶ 84), his Motion for a TRO is premature. As stated in Section I.A of this Opposition, George does not even allege that he has been ***denied*** a scholarship for the 2022-2023 academic year. Nor does he allege that he was admitted to a particular graduate school program; that he otherwise cannot afford to attend the program; or that the program is scheduled to begin imminently, such that a decision regarding his financial aid must be made. Given the lack of such allegations, George has not shown that he faces a threat that is "'certain and great,' 'actual and not theoretical,' and so 'imminen[t] that there is a clear and present need for equitable relief to prevent irreparable harm.'" *Open Tech. Fund*, 470 F. Supp. 3d at 28 (quoting *League of Women Voters of United States v. Newby*, 838 F.3d 1, 7-8 (D.C. Cir. 2016) (alteration in original)).

16

with the granting or withholding of the requested relief,'" and to pay "particular regard for the public consequences in employing the extraordinary remedy of injunction." *Strait Shipbrokers Pte. Ltd. v. Blinken*, --- F. Supp. 3d ---, 2021 WL 3566594, at *12 (D.D.C. Aug. 12, 2021) (quoting *Winter*, 555 U.S. at 24) (alteration in original). "[W]here, as here, the plaintiff's requested injunction is mandatory—that is, where its terms would alter, rather than preserve, the status quo by commanding some positive act, [D.C. courts have] required the moving party to meet a higher standard than in the ordinary case by showing clearly that he or she is entitled to relief or that extreme or very serious damage will result from the denial of the injunction." *Singh v. Carter*, 185 F. Supp. 3d 11, 17 (D.D.C. 2016).

George has not come close to meeting the "higher standard" necessary for the extraordinary relief that he seeks in this case. George was given a full year's advance notice of GW's intent to discontinue the varsity men's rowing team (and it is now almost two years since that notice was given). GW honored its commitment to provide George with financial assistance throughout his attendance as an undergraduate at the University, even though he was no longer participating on a varsity sports team. George and his teammates also have had the opportunity to continue participating in rowing competitions at the club level since the team lost its varsity status—and they have done so as recently as Saturday. *See* Decl. of T. Vogel ¶ 13. George's contention that the only harm to GW resulting from the requested TRO would be the "$200,000 annual budget" for the men's rowing team, Mot. at 18, ignores that the decision to discontinue the team was made on the basis of a "systematic assessment of costs, opportunities and threats" related to the entire University Athletic Department. Compl., Ex. 3 at 1. The decision to discontinue the men's varsity rowing team was made "after a principled process in which all of [GW's] programs were reviewed comprehensively," and the decision-making process included the consideration of factors such as

17

"impact on gender equity and Title IX compliance, sponsorship at the NCAA Division I level, history of the sport at GW and prospect for future success, engagement level, expense savings, and other factors." *Id.*, Ex. 2 at 3. The cost of reinstatement is not simply the associated budget expense, but the judicial encroachment on GW's right to run its Athletics Department as it sees fit.

Enjoining GW to reinstate varsity men's rowing would inhibit "the public interest in allowing educational institutions to plan and control their academic and extracurricular programs." *Sterman*, 513 F. Supp. 3d at 257; *see also Equity in Athletics, Inc. v. Dep't of Educ.*, 504 F. Supp. 2d 88, 112 (W.D. Va. 2007) (finding that the public interest "weighs in favor of permitting colleges and universities to chart their own course in providing athletic opportunities without judicial interference or oversight, absent a clear showing that they are in violation of the law"). Indeed, George has identified no authority that would even authorize the Court to order the extraordinary relief that he seeks. All but one of the cases upon which George relies involved claims under Title IX—which, of course, is not at issue in this suit. The only case not involving Title IX relied upon by George—*McHale v. Cornell University*—addressed NCAA eligibility rules, not the varsity status of a non-NCAA sports team, and in any event, the court in *McHale* denied the plaintiff's motion for a preliminary injunction. 620 F. Supp. 67, 68-69 (N.D.N.Y. 1985).

In short, George has identified no authority that would permit this Court to order the extraordinary relief that he seeks, nor has he shown that such relief is warranted.

## CONCLUSION

For these reasons, Defendant The George Washington University respectfully requests that Plaintiff's Motion for a Temporary Restraining Order be denied.

Dated:  April 7, 2022

Respectfully submitted,

By: /s/    *Jason C. Schwartz*
Jason C. Schwartz (D.C. Bar No. 465837)
Molly T. Senger (D.C. Bar No. 995975)
Amalia Reiss (D.C. Bar No. 241775)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Tel. (202) 955-8242
Fax. (202) 530-4209
JSchwartz@gibsondunn.com
MSenger@gibsondunn.com
AReiss@gibsondunn.com

*Counsel for Defendant The George Washington University*

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of April, 2022, I caused a copy of the foregoing to be served on the below counsel via ECF:

Anand Ramana
VEDDER PRICE P.C.
1401 New York Ave, N.W.
Suite 500
Washington, D.C. 20005
aramana@vedderprice.com

/s/     Jason C. Schwartz
Jason C. Schwartz (D.C. Bar No. 465837)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Tel. (202) 955-8242
Fax. (202) 530-4209
JSchwartz@gibsondunn.com

*Counsel for Defendant*