UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PATRICK GEORGE,<br><br>                Plaintiff,<br><br>         v.<br><br>THE GEORGE WASHINGTON UNIVERSITY,<br><br>                Defendant. | Civil Action No. 22-896 (BAH)<br><br>Chief Judge Beryl A. Howell |

**MEMORANDUM OPINION**

Seeking to undo The George Washington University's ("GW") decision—announced nearly two years ago and implemented nearly ten months ago—to transition its men's rowing team from a varsity to a club sport, plaintiff Patrick George, a senior at GW and captain of its men's rowing team, moves for a preliminary injunction under Federal Rule of Civil Procedure 65 to reinstate his team's varsity status. *See* Pl.'s Mot. Preliminary Injunction ("Pl.'s Mot."), ECF No. 10; Pl.'s Mem. Supp. Mot. Preliminary Injunction ("Pl.'s Mem."), ECF No. 10-1. On April 7, 2022, the Court denied identical relief after a contested hearing extending for close to two hours on plaintiff's emergency motion for a temporary restraining order. *See* Min. Entry (April 7, 2022). GW opposes plaintiff's request for a preliminary injunction. *See* Def.'s Opp'n Pl.'s Mot. Preliminary Injunction ("Def.'s Opp'n"), ECF No. 14. As explained below, this Court again finds that plaintiff has failed to show both a likelihood of success on the merits and that he will suffer irreparable harm absent injunctive relief and therefore denies plaintiff's motion for a preliminary injunction.

1

I.   **BACKGROUND**

Pertinent factual and procedural background for resolution of the pending motion is set out below.

**A. Factual Background**

As alleged in the Complaint, in April 2018, plaintiff, a British citizen, accepted an offer from Mark Davis, who was then the head coach of the GW men's rowing team, "to join the GW Men's Rowing Team and attend GW as an undergraduate student athlete." Compl. ¶ 29, ECF No. 1-1. Plaintiff's acceptance of this offer followed assurances from Davis that, although he could not guarantee plaintiff a scholarship for his freshman year, plaintiff could "earn scholarships for the remaining years of his eligibility" as a member of the rowing team. *Id.* ¶ 28. As head coach, "GW granted [Davis] . . . the authority to recruit student athletes for the Men's Rowing Team." Decl. of Mark Davis ("Davis Decl.") ¶ 4, ECF No. 10-3. Davis avers that, when he recruited plaintiff, "it was understood that if [plaintiff] committed to GW, he would have a spot on the varsity Men's Rowing Team for as long as he was eligible under NCAA rules, so long as he performed well and stayed out of trouble." *Id.* ¶ 10.[1] Plaintiff similarly explains that he "understood GW's offer . . . to be that if [he] performed well and otherwise followed all rules, [he] would be guaranteed a spot on the Men's Rowing Team for all four years of [his] eligibility." Decl. of Plaintiff Patrick George ("Pl.'s Decl.") ¶ 8, ECF No. 10-4.

Plaintiff enrolled at GW in the fall of 2018. Compl. ¶ 32. During his second semester on campus, around February or March 2019, plaintiff alleges that he accepted scholarship offers of $60,000 for his sophomore year and $70,000 per year for both his junior and senior years. *Id.* ¶¶

---

[1] Although men's rowing programs at the university level are sponsored by the Intercollegiate Rowing Association ("IRA") and not the National Collegiate Athletic Association ("NCAA"), *see* Compl. n.1, the IRA has generally adopted NCAA "rules and regulations [as] . . . a base for [its] eligibility requirements," Decl. of Chandra Bierwirth, GW Associate Athletics Director, ("Bierwirth Decl.") ¶ 15, ECF No. 14-2.

35, 38.  Plaintiff's acceptance of these scholarships was thereafter memorialized in an annual "Athletics Financial Aid Agreement" stating that "this document is the only binding agreement between the University and [plaintiff]" and that "[c]oaches and other university employees cannot obligate the University beyond this agreement."  First Decl. of Tanya Vogel, GW Athletics Director, ("First Vogel Decl."), Ex. A, June 11, 2019 Athletics Financial Aid Agreement, ECF No. 6-1; *Id.*, Ex. B, June 3, 2020 Athletics Financial Aid Agreement.  Plaintiff has received from GW the agreed-to scholarship awards for each of these academic years.  Compl. ¶¶ 41, 59, 72.

    In January 2020, Eric Gehrke succeeded Davis as head coach of the GW men's rowing team.  *Id.* ¶ 43.  Two months later, in March 2020, the emergence of the COVID-19 pandemic forced the cancellation of the men's rowing season.  *Id.* ¶ 44.  To compensate for the suspended seasons, the NCAA chose to "extend all collegiate athletes' eligibility for one year."  *Id.* ¶ 45.[2]  Varsity athletes could traditionally only compete with their teams for four years.  Decl. of Eric Gehrke ("Gehrke Decl.") ¶ 13, ECF No. 10-2.  Under the pandemic-driven modification to NCAA eligibility rules, qualifying athletes were now allowed to compete for five years to make up for the seasons cut halfway through the 2019-2020 academic year.  *Id.*  ¶¶ 13-14.  In a May 2020 meeting with the men's rowing team, Gehrke conveyed that not all team members would be able to row a fifth year pursuant to the NCAA's eligibility extension.  *Id.* ¶ 20.  Gehrke further explained to the team that "use of [the] 5th year does not guarantee previous scholarship[s] and will be discussed on an individual basis," and that those interested in rowing for an additional

---

[2]     As explained *supra* n.1, although men's rowing is not an NCAA sport, NCAA eligibility rules have been generally adopted by the IRA, which on April 1, 2020 issued a memorandum announcing that "it would not be taking a more restrictive stance than the NCAA regarding the COVID-related eligibility extensions."  Bierwirth Decl. ¶ 17; *see also* Def.'s Opp'n at 3 n.1.

year "would need to discuss what they wanted to do during their fifth year; potential graduate or certificate programs that might be available; and the cost of those programs." *Id.* ¶¶ 20-21.

Over two months later, on July 31, 2020, GW announced that men's rowing would no longer be part of its varsity roster and instead become a club sport. *See* Compl. ¶¶ 51-52.[3] This transition was not scheduled to take effect for another year until after the conclusion of the 2020-2021 academic year, thereby providing any affected students with sufficient notice should they "choose to transfer to another institution." Compl., Ex. 2, July 31, 2020 Email to University Community, at 2. GW made clear at the time of this announcement that "[a]ll existing athletics scholarship aid will continue to be awarded to the affected student-athletes through their graduation." *Id.*

GW's decision to transition men's rowing and other teams out of the varsity program stemmed from "growing financial concerns" and the "projected financial impacts of COVID-19," which in July 2020 were on track to "create a significant gap between expected revenues and expenses of at least $200 million" for the university. *Id.* at 1. According to GW Athletics Director Tanya Vogel, based on those financial concerns, possible changes to GW's athletic offerings were then assessed through a holistic review of "multiple criteria, including: (i) impact of gender equity and Title IX compliance; (ii) sponsorship of the sport at the NCAA Division I level; (iii) number of teams competing nationally in the sport; (iv) GW history of the program; (v) prospects for future success at GW; (vi) community engagement level and potential the sport brings to the University; (vii) potential expense savings if the sport were discontinued; (viii) investments required to keep the program at, or bring the program to, the desired level of

---

[3] The same day, GW announced that six other athletic teams would also be removed from its varsity program, namely: (1) men's squash; (2) men's indoor track; (3) men's tennis; (4) women's squash; (5) women's water polo; and (6) co-ed sailing. *See* Compl. ¶ 51.

4

excellence; and (ix) for non-NCAA teams like men's rowing, whether they had the ability to continue operating as GW club programs in the same or similar competitions moving forward." Second Decl. of Tanya Vogel ("Second Vogel Decl.") ¶ 24, ECF No. 14-1. Recognizing that the men's rowing team could "continue to compete in the same or similar conferences against the same competition that [it] did as [a] varsity program[]," GW committed to support the team in its transition to a club sport. Compl., Ex. 3, FAQ Regarding University Efforts Streamlining GW Athletics, at 2.

In the fall of 2020, plaintiff was elected by his teammates to serve as captain of the men's rowing team for its final varsity season. Compl. ¶ 63. He subsequently led unsuccessful efforts to lobby the GW administration and Board of Trustees to maintain the team's varsity status. *See id.* ¶¶ 64-65, 69, 73-77; *see also* Pl.'s Decl. ¶¶ 36, 38, 42. On July 1, 2021, the changes to GW's athletics program announced a year earlier became effective and the men's rowing team officially became a club sport. Pl.'s Decl. ¶ 35. As a club sport, the team is unable "to compete at any IRA sanctioned event," including the IRA National Collegiate Championship Regatta set for June 2022. Compl. ¶ 79. In March 2022, plaintiff "filed an exception request with the IRA" seeking to allow his team's participation in the upcoming June 2022 regatta even though it was now only part of GW's club sports program. *Id.* ¶ 81. The IRA denied this request because "the Men's Rowing Team no longer satisfied the 'varsity status' requirement under the IRA's Constitution." *Id.* ¶ 82.

Notwithstanding the GW men's rowing team's status change from varsity to club, plaintiff has continued to row and compete at the intercollegiate level as team captain. On April 2, 2022, for instance, plaintiff led the GW men's *club* rowing team in a race against Georgetown University's *varsity* men's rowing team that kicked off the team's 2022 season. *Id.* ¶ 83.

5

Plaintiff is set to graduate from GW at the conclusion of the current academic year. Transcript of TRO Hearing (April 11, 2022) ("TRO Hr'g Tr.") at 27:21-25, ECF No. 9. The record provides no indication that plaintiff will remain enrolled at the University as a graduate student or in any other capacity during the upcoming 2022-2023 academic year.

### B. Procedural Background

On April 1, 2022, almost two years after GW announced that the men's rowing team would become a club sport, plaintiff initiated this litigation in D.C. Superior Court, after which GW promptly removed the case to this Court, invoking diversity jurisdiction under 28 U.S.C. §1332(a)(2). *See generally* Notice of Removal, ECF No 1. Plaintiff's complaint asserts three claims against GW: (1) breach of contract (Count I), Compl. ¶¶ 87-94; (2) fraud (Count II), *id.* ¶¶ 95-101; and (3) a violation of the D.C. Consumer Protection Procedures Act, D.C. Code §§ 28-3901 *et seq.*, (Count III), *id.* ¶¶ 102-106. As relief, plaintiff seeks a "permanent injunction ordering GW to immediately reinstate the Men's Rowing Team to varsity status," compensatory and punitive damages, and attorneys' fees. *See id.* ¶¶ 87-106.

On April 5, 2022, plaintiff moved for a temporary restraining order "immediately prohibiting GW from *cutting* the Men's Rowing Team as a varsity sport," even though, as explained *supra*, the men's rowing team had not been a varsity sport since July 1, 2021. Pl.'s Emergency Mot. TRO at 20-21, ECF No. 2-1 (emphasis added). That same day plaintiff also filed a motion to expedite discovery in anticipation "of any preliminary injunction hearing in this action." Pl.'s Mot. Expedited Discovery and Mem. Supp. at 1, ECF No. 3.[4] Following a

---

[4] An evidentiary hearing is unnecessary here since no disputed material fact has been raised precluding adjudication, on the papers, of plaintiff's motion for preliminary injunction. *Cobell v. Norton*, 391 F.3d 251, 261 (D.C. Cir. 2004) ("A preliminary injunction may be granted based on less formal procedures and on less extensive evidence than in a trial on the merits, but if there are genuine issues of material fact raised in opposition to a motion for a preliminary injunction, an evidentiary hearing is required." (internal citations omitted)); *see also Shvartser v. Lekser*, 330 F. Supp. 3d 356, 361 (D.D.C. 2018) (finding evidentiary hearing unnecessary to rule on motion for preliminary injunction where defendants did not request hearing or raise any "genuine issues of material fact").

contested hearing lasting almost two hours, on April 7, 2022, the Court denied plaintiff's motion for a temporary restraining order.  Min. Entry (April 7, 2022).

Based on the parties' competing proposals to govern further proceedings in this matter following denial of the temporary restraining order, the Court adopted GW's proposed scheduling order allowing the parties to brief plaintiff's anticipated motion for a preliminary injunction in accordance with the deadlines provided in the Court's Local Civil Rules.  *See* Min. Order (April 11, 2022).  On April 13, 2022, plaintiff filed the pending motion seeking a preliminary injunction "immediately restoring the Men's Rowing Team as a varsity sport," Pl.'s Mot. at 1, and GW filed its opposition to this motion on April 20, 2022, *see generally* Def.'s Opp'n.  On April 29, 2022, two days after plaintiff filed a reply in further support of his motion, *see* Pl.'s Reply Supp. Mot. Preliminary Injunction ("Pl.'s Reply"), ECF No. 17, the Court was notified by the Clerk's Office (not by the parties) that this action had not been assigned a case number in D.C. Superior Court and that, as such, removal to this Court was defective.  The parties were thereafter directed to file "a joint status report advising . . . as to everything that ha[d] transpired regarding this case's apparently defective removal from D.C. Superior Court."  Min. Order (May 6, 2022).  In compliance with that order, on May 10, 2022, the parties advised that—following refiling of plaintiff's complaint for proper processing in D.C. Superior Court—this matter was now assigned a Superior Court number and that a "notice of filing of notice removal" had been docketed in Superior Court to "effect the removal" to this Court pursuant to 28 U.S.C. § 1446(d).  Joint Status Report at 2-3 (May 10, 2022), ECF No. 18.

---

Plaintiff's request to expedite discovery thus need not be addressed further and is denied as moot to the extent based on an anticipated evidentiary hearing when "[t]he practice in this jurisdiction is to decide preliminary injunction motions without live testimony where possible," D.D.C. LOCAL CIVIL RULE 65.1(d), and that is certainly possible here.  In any event, granting a motion to expedite discovery—which plaintiff filed over a month *before* he completed service on GW, *see* Request for Summons (May 13, 2022), ECF No. 19—would have been unwarranted given the "general rule [that] discovery proceedings take place only *after* the defendant has been served," *Attkisson v. Holder*, 113 F. Supp. 3d 156, 165 (D.D.C. 2015) (emphasis added) (citations omitted).

In the same May 10, 2022 Joint Status Report, GW also alerted the Court that, over a month since removal from D.C. Superior Court, "no summons ha[d] yet issued from the Superior Court or from this Court" and thus that it still "ha[d] not been properly served" by plaintiff in this action. *Id.* ¶ 24. Plaintiff was then directed to show cause "why his Motion for Preliminary Injunction should not be denied for failure to complete service on defendant as required under Federal Rule of Civil Procedure 4." Min. Order (May 13, 2022); *id.* (highlighting language from plaintiff's briefing describing the "technical service of a summons and complaint" as a "practical waste" in the current posture of this case); *see also* Pl.'s Response to Order Show Cause at 1 (May 16, 2022), ECF No. 22 (subsequently apologizing "to this Court if [plaintiff] has misunderstood his service obligations under the law"). Minutes after being compelled to show cause, plaintiff moved to complete service on GW, *see* Request for Summons to Issue (May 13, 2022), ECF No. 19, and GW was finally served with a summons for this action on May 16, 2022—a month and three days after plaintiff moved for a preliminary injunction. With service perfected and the Court satisfied that jurisdiction may be exercised over defendant, the pending motion is now ripe for resolution.[5]

## II.   LEGAL STANDARD

A preliminary injunction "is a stopgap measure, generally limited as to time, and intended to maintain a status quo or 'to preserve the relative positions of the parties until a trial on the merits can be held.'" *Sherley v. Sebelius*, 689 F.3d 776, 781–82 (D.C. Cir. 2012) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). The moving party must establish that (1)

---

[5] The 21-day window ordinarily set as an objective in which to resolve motions for preliminary injunction, *see* D.D.C. LOCAL CIVIL RULE 65.1(d), necessarily lapsed as the Court was alerted and sought clarification from the parties regarding defects in the removal of this action from D.C. Superior Court, *see* Min. Order (May 6, 2022), and plaintiff's month-long delay in properly serving GW, *see* Min. Order (May 13, 2022), before proceeding to adjudicate the instant motion.

they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities" is in their "favor"; and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *see also League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016); *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016). The first factor is also the "most important factor." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014); *see also Munaf v. Geren*, 553 U.S. 674, 690 (2008) ("[A] party seeking a preliminary injunction must demonstrate, among other things, 'a likelihood of success on the merits.'" (quoting *Gonzales v. O Centro Espirita Beneficente União do Vegetal*, 546 U.S. 418, 428 (2006)).[6] Moreover, "'[t]he basis of injunctive relief in the federal courts has always been irreparable harm,'" and if a party fails to make a showing of irreparable harm, "that alone is sufficient . . . to conclude that the district court did not abuse its discretion." *CityFed Fin. Corp. v. Off. of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995) (quoting *Sampson v. Murray*, 415 U.S. 61, 88, 94 (1974)). A preliminary injunction "is an extraordinary . . . remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion" on each of the four factors. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (emphasis omitted) (quoting 11A C. WRIGHT, A. MILLER, & M. KANE, FED. PRAC. & PROC. § 2948 (2d ed. 1995)).

---

[6] The D.C. Circuit has previously followed a "sliding scale" approach to evaluating preliminary injunctions, but that approach is likely inconsistent with *Winter*, *see Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018) (observing that *Winter* may be "properly read to suggest a 'sliding scale' approach to weighing the four factors be abandoned" (quoting *League of Women Voters*, 838 F.3d 1, 7 (D.C. Cir. 2016)); *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1295-96 (D.C. Cir. 2009) (Kavanaugh, J., concurring) (noting that "this Circuit's traditional sliding-scale approach to preliminary injunctions may be difficult to square with the Supreme Court's recent decisions in" *Winter* and *Munaf*), and therefore will not be employed here, *Singh v. Carter*, 185 F. Supp. 3d 11, 16-17 (D.D.C. 2016).

### III. DISCUSSION

Plaintiff requests a preliminary injunction "to *reinstate* [the GW] men's rowing team to varsity status for the remainder of the proceedings." Pl.'s Mot. at 1 (emphasis added). As noted, the GW men's rowing team ceased to be a varsity sport on July 1, 2021. Pl.'s Decl. ¶ 35. Plaintiff therefore does not seek relief to maintain the status quo, the typical purpose of a preliminary injunction. *See Sherley*, 689 F.3d at 781. Instead, plaintiff moves for a mandatory injunction to alter, rather than preserve, the status quo by compelling GW to modify the operations of the men's rowing team as a club sport, a status that has been in place for almost a year. "Plaintiffs seeking this type of relief . . . face an additional hurdle when proving their entitlement to relief" and courts "exercise extreme caution in assessing" such motions. *Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. de C.V.*, 901 F. Supp. 2d 54, 56-57 (D.D.C. 2012) (quoting *King v. Leavitt*, 475 F. Supp. 2d 67, 71 (D.D.C. 2007)). Indeed, "[a]s a rule, [w]hen a mandatory preliminary injunction is requested, the district court should deny such relief unless the facts and law clearly favor the moving party." *Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi Ltd.*, 15 F. Supp. 2d 1, 4 (D.D.C. 1997) (citations omitted). As explained below, plaintiff fails to overcome this high hurdle at each step of the requisite four-pronged showing for preliminary injunctive relief, and his motion must be denied. *See Winter*, 555 U.S. at 20.

#### A. Likelihood of Success on the Merits

Plaintiff only seeks preliminary injunctive relief based on the likelihood of success of his breach of contract claim (Count I). *See* Pl.'s Mem. at 13 n.5. [7] According to plaintiff, the

---

[7] Plaintiff "reserve[s] . . . adjudication at a later date" for the fraud and violation of the D.C. Consumer Protection Procedures Act claims he asserts, respectively, in Counts II and III of his complaint. Pl.'s Mem. at 13 n.5.

10

"promises and conduct of both parties bound both GW and [plaintiff] in an implied-in-fact contract that obligated GW to maintain a varsity Men's Rowing Team for as long as [plaintiff] was eligible under NCAA regulations," which eligibility period at the time plaintiff enrolled at GW was four years. *Id.* at 15.

To prevail on a breach of contract claim, "a party must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." *Shaffer v. George Washington Univ.*, 27 F.4th 754, 762 (D.C. Cir. 2022) (quoting *Mawakana v. Bd. of Trs. of Univ. of D.C.*, 926 F.3d 859, 869 (D.C. Cir. 2019)).[8] "Under D.C. law, an implied-in-fact contract contains 'all necessary elements of a binding agreement,'"—including offer, acceptance, and consideration—and "differ[s] from other contracts 'only in that it has not been committed to writing' and is instead 'inferred from the conduct of the parties.'" *Camara v. Mastro's Rests. LLC*, 952 F.3d 372, 375 (D.C. Cir. 2020) (quoting *Boyd v. Kilpatrick Townsend & Stockton*, 164 A.3d 72, 81 (D.C. 2017)); *see also Vereen v. Clayborne*, 623 A.2d 1190, 1193 (D.C. 1993) (implied-in-fact contract is "inferred from the conduct of the parties in the milieu in which they dealt" (quoting *Bloomgarden v. Coyer*, 479 F.2d 201, 208 (D.C. Cir. 1973)). Particularly pertinent here, "the representative whose conduct is relied upon" must have "authority to bind." *Amfac Resorts LLC v. U.S. Dep't*

---

[8] In *Shaffer*, the D.C. Circuit recently held that plaintiffs, students at GW and Catholic University, had plausibly pleaded the existence of an implied contract guaranteeing in-person learning, for which the students had already paid, based on (1) communications from the defendant universities containing "numerous references" to the benefits of in-person learning, (2) the higher student fees for in-person learning as compared to online learning, and (3) the universities' "historic practice of providing on-campus instruction to students who pay the tuition associated with traditional on-campus . . . education." 27 F.4th at 763-764. The allegations and evidentiary proffer of the *Shaffer* plaintiffs found sufficient to state an implied contract claim, derived from clear statements attributable directly to GW and long-standing practice, stand in stark contrast with the comparative scant evidence plaintiff puts forth here, derived from Coach Davis, whose authority was limited to recruitment with no guarantees even of scholarship funding, *see* Davis Decl. ¶¶ 4, 10, and plaintiff's understanding, with what he deems to be an "obvious assumption," of the offer plaintiff received in early 2018 to join the GW men's rowing team, *see* Pl.'s Decl. ¶ 8; *see also* Pl.'s Mem. at 18 ("GW expressly offered [plaintiff] a position on the varsity Men's Rowing Team. That offer included the obvious assumption of a four-year varsity experience as contemplated by NCAA regulations.").

*of Interior*, 142 F. Supp. 2d 54, 74 (D.D.C. 2001). Moreover, "words that merely 'express[] an expectancy' regarding future conduct do not suffice to create a contractual obligation 'susceptible of enforcement.'" *Shaffer*, 27 F.4th at 763 (quoting *Basch v. George Wash. Univ.*, 370 A.2d 1364, 1368 (D.C. 1977) (holding that university bulletin merely estimating anticipated future tuition increases was insufficient to support express or implied contractual obligation)). As the party asserting the contract's existence, plaintiff bears the burden of proof. *See Bailey v. Fed. Nat'l Mortg. Ass'n*, 209 F.3d 740, 746 (D.C. Cir. 2000).

Plaintiff's claim for breach of an implied-in-fact contract is unlikely to succeed. As a threshold matter, GW is correct that plaintiff "concedes he has no express contract . . . with anyone at GW that guaranteed GW's provision of men's rowing as a varsity sport." Def.'s Opp'n at 11. Notably, the only signed agreements between GW and plaintiff available in the record—the two "Athletics Financial Aid Agreements" that plaintiff entered for his sophomore and junior years—identify the sport practiced by plaintiff just as "Men's Rowing" and both provide that "[t]his document is the only binding agreement between the University and [plaintiff]," at least for purposes of plaintiff's financial aid awards. First Vogel Decl., Ex. A, June 11, 2019 Athletics Financial Aid Agreement, *id.*, Ex. B, June 3, 2020 Athletics Financial Aid Agreement. Plaintiff nevertheless argues that GW's offer before he matriculated at GW, through Coach Davis, of "a position on the varsity Men's Rowing Team . . . included the obvious assumption of a four-year varsity experience as contemplated by NCAA regulations." Pl.'s Mem. at 18. While Coach Davis may have conveyed to plaintiff his expectation that he would be able to row as part of a varsity team for his entire undergraduate career, there is no basis to conclude the asserted implied-in-fact-contract for *provision* of a varsity team was ever formed since plaintiff offers no evidence that Coach Davis had the authority to bind GW in such a

capacity for years into the future, no matter the financial circumstances of GW, let alone changing global conditions due to a pandemic.  *See Boyd*, 164 A.3d at 83 (affirming dismissal of implied-in-fact contract claim because plaintiff did not show representative possessed "authority to bind" organization "to a contractual obligation").

To the contrary, evidence supplied by both parties indicates that Davis's authority to act on behalf of GW was narrow.  Davis affirms, for example, that he was only granted authority from GW "to *recruit* student athletes for the Men's Rowing Team."  Davis Decl. ¶ 4 (emphasis added).  Accordingly, Davis and his fellow coaches even lacked "authority to award any financial aid to any student athletes," although GW would generally defer to their recommendations regarding "how to divide the full scholarship amount among the student athletes on the[ir] team[s]."  Gehrke Decl. ¶ 12.  Plaintiff knew that Davis's authority was not far-reaching before accepting his offer to attend GW as a student-athlete, admitting in the Complaint that Davis "could not provide assurances that [plaintiff] could earn a scholarship" during his freshman year.  Compl. ¶ 28.  Davis's limited scope of authority to act on GW's behalf is further confirmed by the "Athletics Financial Aid Agreements" executed by the parties, stating that "[c]oaches and other university employees cannot obligate the University beyond this agreement."  First Vogel Decl., Ex. A, June 11, 2019 Athletics Financial Aid Agreement; *id.*, Ex. B, June 3, 2020 Athletics Financial Aid Agreement.  Upon plaintiff's acceptance of his offer to matriculate at GW as a student athlete in early 2018, Davis just "expected [plaintiff] to row for the Men's Rowing Team" for the four years of his undergraduate career—which is a far cry from requiring or obligating GW from that point forward to maintain a varsity men's rowing team in service of plaintiff's collegiate rowing experience.  Davis Decl. ¶ 12.

In light of these circumstances, with no indication that Davis possessed authority to bind GW beyond the recruitment of student athletes, the Court is unable to "infer[], as a fact," that there was a "tacit understanding" between even Davis and plaintiff, let alone GW and plaintiff, requiring GW to keep the men's rowing team on its varsity program. *See Sabre Int'l Sec. v. Torres Advanced Enter. Sols., Inc.*, 820 F. Supp. 2d 62, 72-73 (D.D.C. 2011). Indeed, no "reasonable person would . . . assume[]" from their communications with a coach for purposes of prospectively joining a team as a freshman that "the University intend[s] to bind itself" to maintaining that same team as a varsity sport years into the future. *See Basch*, 370 A.2d at 1367 (directing analysis, in "construing the terms of a contract" and "ascertaining [its] intent," of the "circumstances surrounding the making of the contract" and the perspective of "a reasonable person in the position of the parties"); *see also Shaffer*, 27 F.4th at 764. To adopt plaintiff's view that implied contracts binding a university may form out of whole cloth from interactions between student-athletes and their coaches "would effectively mean that a university could never discontinue any varsity sport without facing a breach of contract claim from a student-athlete." Def.'s Opp'n at 16, n.6. Empowering student athletes and their coaches in this manner would effectively put them in charge, rather than the university trustees and management tasked with balancing the full panoply of priorities of a higher learning institution, including academic excellence.

In sum, the expectation of both plaintiff and Coach Davis that plaintiff would row for a *varsity* team during the entirety of his undergraduate career, while certainly aspirational, simply does "not suffice to create a contractual obligation 'susceptible of enforcement'" absent any indication that Davis could bind GW to such an obligation. *See Shaffer*, 27 F.4th at 763 (quoting *Basch*, 370 A.2d at 1368); *Patriot, Inc. v. U.S. Dep't of Hous. & Urb. Dev.*, 963 F. Supp. 1, 6-7

(D.D.C. 1997) (finding that to establish likelihood of success on merits of implied contract claim "mere expectancy of a continued course of conduct is not enough, even in situations where the disappointment of expectations results in a heavy financial loss"). Other than allowing plaintiff to participate in the men's rowing team "so long as he performed well and stayed out of trouble," Davis Decl. ¶ 10, and providing plaintiff with scholarship awards beginning his sophomore year, Compl. ¶¶ 35, 38—which obligations GW has indisputably fulfilled here, *id.* ¶¶ 41, 59, 72, 83—no further obligations on GW's part are ascertainable from the record. Plaintiff has thus failed to demonstrate a likelihood of success on the merits of his breach of contract claim.

### B. Irreparable Harm

Plaintiff also fails to meet the "high standard for irreparable injury" required for preliminary injunctive relief. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). To show irreparable harm, plaintiff must demonstrate that he faces an injury that is "both certain and great," "actual . . . not theoretical," and "of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam) (internal quotation marks and emphasis omitted). Further, plaintiff must show "the alleged harm will directly result from the action which the [plaintiff] seeks to enjoin," as "the court must decide whether the harm will *in fact* occur." *Id.* (emphasis in original); *see also Winter*, 555 U.S. at 22 (rejecting "'possibility' standard [as] too lenient," explaining "[our] frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." (emphasis in original)).

According to plaintiff, he will suffer irreparable harm "because he is forever losing the opportunity to participate in competitive intercollegiate rowing at GW." Pl.'s Mem. at 22.

15

Plaintiff asserts that "varsity rowing at the college level is completely different than club rowing" and that the "competitive nature" of rowing at the varsity level "is not even comparable."  Pl.'s Decl. ¶ 50.  Absent preliminary injunctive relief, plaintiff contends that he "will be denied his senior season as the Men's Rowing Team Captain" and also "be denied the opportunity to compete in invitational tournaments that only permit varsity sports—including the . . . IRA national championships in June 2022."  Pl.'s Mem. at 24.  In plaintiff's view, "[t]here is no greater irreparable harm for an elite collegiate athlete than depriving him of the sport for which he has trained for half of his life."  *Id.* at 24-25.  While plaintiff's dire disappointment that he was able to participate in a varsity men's rowing team for only three of his four college years is palpable, this purported showing of irreparable harm is wholly insufficient.

To begin, plaintiff has continued practicing his chosen sport for the entirety of his time at GW—including during the most recent academic year after his team transitioned to club status.  He remains captain of the GW men's rowing team, which just last month competed in a regatta against Georgetown's varsity men's rowing team.  *See* Compl. ¶¶ 63, 83; Pl.'s Decl. ¶ 47.  Plaintiff's own representations about his ability to still compete as a member of the club team, even against other varsity teams like Georgetown's, thus plainly belie his assertion that he "will be denied his senior season as the Men's Rowing Team Captain" if not granted preliminary injunctive relief.  Pl.'s Mem. at 24.  Moreover, to the extent he asserts harm derived from not competing in the June 2022 IRA regatta, plaintiff appears to be seeking relief from the incorrect party.  The IRA, which is not a party to this litigation, rather than GW, the defendant in this action, is the entity which has denied, based on a "varsity status requirement under the IRA's Constitution," requests from plaintiff's team to allow the team's participation the upcoming regatta.  Compl. ¶¶ 81-82.  In any event, plaintiff's inability to compete in the June 2022 IRA-

16

sponsored race does not amount to irreparable harm, given his team's active participation in other regattas with varsity teams from other colleges. *Cf. Ganden v. Nat'l Collegiate Athletic Ass'n*, No. 96-cv-6953, 1996 WL 680000, at *6 (N.D. Ill. Nov. 21, 1996) (denying injunctive relief because plaintiff "failed to demonstrate irreparable harm from missing a single" swim competition).

Since plaintiff is set to graduate from GW this month, *see* TRO Hr'g Tr. at 27:21-25, and there is no indication in the record he will remain enrolled at GW for graduate studies or in any other capacity for the upcoming academic year, ascertaining what "irreparable injury is likely in the absence of an injunction" at this late stage of plaintiff's undergraduate career is difficult if not impossible. *See Winter*, 555 U.S. at 22; *see also* Def.'s Opp'n at 4 n.2 ("[R]owing for a fifth season would be contingent on a rower still matriculating at GW either as an undergraduate or graduate student."). As GW points out, nothing prevents plaintiff from "tak[ing] advantage of his additional year of eligibility [under the NCAA rules] at another University that offers graduate programs and maintains a varsity men's rowing team." Def.'s Opp'n at 24. By waiting almost two years since the changes to GW's varsity program were announced and until a month before his graduation to file the instant action, plaintiff himself undermined his claim to irreparable harm. *See Dall. Safari Club v. Bernhardt*, 453 F. Supp. 3d 391, 403 (D.D.C. 2020) ("[U]nexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies lack of urgency and irreparable harm."). Plaintiff has accordingly failed to show irreparable harm warranting the requested preliminary injunctive relief.

### C. The Balance of Equities and Public Interest

Finally, both the balance of the equities and public interest weigh in GW's favor and against issuance of preliminary injunctive relief to plaintiff. The Court need not linger on its

analysis of these factors given that plaintiff has demonstrated neither a likelihood of success on the merits nor irreparable harm. *See Toxco Inc. v. Chu*, 724 F. Supp. 2d 16, 32-33 (D.D.C. 2010).

The extraordinary relief plaintiff seeks to restore the men's rowing team to varsity status would alter the status quo of a decision made by GW leadership and its Board of Trustees almost two years ago to relieve significant financial stress generated by the COVID-19 pandemic. *See* Compl., Ex. 2, July 31, 2020 Email to University Community (noting that financial impact of COVID-19 was expected to generate $200 million "gap" between GW's revenues and expenses). Thus, granting plaintiff's requested relief would upend the careful analysis and review of financial and myriad other considerations that led GW to restructure its varsity programs as it sought to mitigate the effects of a global pandemic that persists to this date. *See* Second Vogel Decl. ¶ 24 (discussing "holistic" review process that culminated in changes to GW's athletics program). These concerns outweigh any purported harm to plaintiff from the transition of the men's rowing team from varsity to club status. Declining to enjoin GW also advances the public interest by "allowing educational institutions to plan and control their academic and extracurricular programs." *Sterman v. Brown Univ.*, 513 F. Supp. 3d 243, 257 (D.R.I. 2021) (denying preliminary injunction against Brown University for transitioning men's and women's squash teams from varsity to club status).

## IV. CONCLUSION

For the foregoing reasons, plaintiff cannot meet "the demanding standard for a mandatory preliminary injunction," *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 319 (D.C. Cir. 2018), and he is not entitled to such extraordinary relief. Plaintiff's motion for preliminary injunction, ECF No. 10, is accordingly DENIED, and his motion to expedite

discovery, ECF No. 3, in connection with a preliminary injunction hearing is DENIED AS MOOT.  An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date: May 27, 2022

_____
BERYL A. HOWELL
Chief Judge